Mildred McClendon Jaggers **FREED**, Plaintiff,

v.

**PROTECTIVE LIFE INSURANCE COMPANY**, Defendant.

**Civ. A. No. 73H-76(R).**

United States District Court, S. D. Mississippi, Hattiesburg Division.

June 10, 1975.

Jon A. Swartzfager and Paul Swartzfager, Laurel, Miss., for plaintiff.

Louis G. Baine, Jr., Jackson, Miss., for defendant.

## OPINION OF THE COURT

RUSSELL, Chief Judge.

Plaintiff, Mildred McClendon Jaggers Freed, a resident of Harrison County, Mississippi, originally filed her action in the First Judicial District of the Circuit Court of Hinds County, Mississippi, against Protective Life Insurance Company, a non-resident corporation but with a designated Mississippi resident agent for purposes of process. The defendant removed the action on the grounds of diversity of citizenship and the required jurisdictional amount. On motion of the defendant, the Court transferred the case to the Hattiesburg Division because the cause of action accrued in Hattiesburg, Mississippi, and because most of the witnesses at the time of the trial were residents of Hattiesburg.

Plaintiff's action seeks to recover from defendant the sum of $25,000.00 as accidental death benefits under an insurance policy issued by the defendant in which plaintiff's former husband, Michael Earl Jaggers, was the named insured and plaintiff was the named beneficiary. Plaintiff alleges that said defendant issued said Policy No. 285789, together with Rider P–509, on October 12, 1971, and that the policy and rider were both in full force and effect on December 21, 1972 when Jaggers met his death. Plaintiff has been paid the face value of the policy $25,000.00, and claims an additional such sum under the double indemnity provision of the policy and rider on the grounds that the insured died from bodily injury directly and independently of all other causes, his death having occurred from gunshot wounds not self-inflicted. Plaintiff attached to her complaint a partial copy of the policy and a certified copy of a death certificate pertaining to Jaggers.

Defendant, in its answer, admitted that it issued Policy No. 285789 and Rider P–509, attaching a complete copy thereto, admitted that it paid the face value of the policy in the sum of $25,000.00 to plaintiff, and that it has refused to pay accidental death benefits. Defendant, quoting from its policy under "Definitions and Exclusions," says that "bodily injury" is defined as "bodily injury sustained directly and independently of all other causes through external, violent and accidental means." Defendant, while admitting that the deceased died of gunshot wounds, not self-inflicted, denies that plaintiff is due accidental death benefits under the aforesaid definition, and affirmatively charges that the deceased culpably provoked an encounter, or was the aggressor therein, resulting in his death, and such death from gunshot wounds was the natural and probable consequence of the decedent's own acts, who knew or should have known that his conduct would result in his injury or death.

The cause was tried to the Court without a jury. Since then the Court has had the benefit of briefs from both parties.

At the trial, plaintiff offered into evidence a copy of the declaration, a copy of the policy and rider, a copy of the death certificate, and a copy of defendant's answer in which defendant admitted that death occurred to the decease*d*

from gunshot wounds not self-inflicted. In a pre-trial order not offered into evidence, and, after introducing the above enumerated documentary evidence, plaintiff acknowledged that she had no live witnesses to testify and rested her case. Whereupon, defendant moved for a judgment of dismissal on the grounds that plaintiff had failed to produce evidence of death caused by "accidental means." Both sides, in arguing the motion, relied on the holding in *Taylor v. Insurance Company of North America*, 263 So.2d 749. In *Taylor*, the Mississippi Supreme Court, speaking through Justice Rodgers said: "It is true that where an injury causing death appears to have been sustained through external and violent means, a presumption arises that such injury was sustained through accidental means." Other Mississippi cases were cited in support. Then in the next two paragraphs, Judge Rodgers said: "Although it is sometimes said that the burden of proof shifts to the defendant, strictly speaking, the burden of proof never shifts to the defendant. Where a plaintiff has made out a prima facie case of 'accidental death' the defendant is then required to go forward with the proof to show that the prima facie testimony of an accident is not the true facts.

"On the other hand, where the plaintiff's own testimony shows that the death of the insured was brought about by the wrongful acts of the insured himself, the defendant is not required to go forward with affirmative proof to rebut the presumption established by a prima facie case."

■■ The Court reserved ruling on defendant's motion and directed the defendant to proceed with its side of the case. Before considering the merits, the Court, in applying the above *Taylor* doctrines to this action at the time of defendant's motion, finds, inasmuch as plaintiff's declaration, together with the death certificate, and the admissions of the defendant that Jaggers had met his death through external and violent means, established a prima facie case

that the death was sustained through "accidental means." At the same time plaintiff offered no testimony from which it could be inferred that the death of the insured was brought about by the wrongful acts of the insured, in which case defendant would not have been obliged to go forward. At this stage of the proceedings, the Court feels that it was correct in not granting defendant's motion until the defendant moved forward on its contention that the death was not "accidental" within the meaning of the policy. This Court in dealing previously with a similar construction of an insurance policy providing for double indemnity in case of accidental death has relied on the law as stated in *Scales v. Home Life Insurance Co.*, 89 F.2d 580, a case similarly factual to the case sub judice. In *Scales*, the Fifth Circuit Court of Appeals held that in a suit on an accident policy for death from "external, violent and accidental" causes, the exact phraseology of the instant policy, mere proof of death will not suffice, but plaintiff must prove also that the death was not accidental. This holding does no violence to the doctrines laid down in *Taylor*. After the defendant was directed to go forward with its proof that the death of Jaggers was not accidental but provoked by him, it then became plaintiff's burden to offset by showing that the death was indeed "accidental". At the conclusion of defendant's evidence, and notwithstanding plaintiff's having rested, the Court allowed both parties to direct interrogatories to an absent witness.

The defendant, seriatim, offered the testimony of police officers of the City of Hattiesburg, Mississippi, who investigated the circumstances of Jaggers' death.

Captain Allen Fulton Adams, one of five investigating officers, testified that on the night of December 21, 1972, he received a radio call that a shooting had occurred at the Chateau Grand Apartments on Hardy Street in Hattiesburg. As he arrived, two persons, later identi-

fied as David Kiser and Wayne Barrett, asked him to call an ambulance. The officer went to an upstairs apartment, No. 22, to find out if an ambulance was necessary. He could get the front door open only enough to see a man's body on the floor which was partially blocking the door from opening inward. He saw a severe wound to the head, a lot of blood, and no body movement. The body was lying on its right side with a revolver nearby. The witness determined that a coroner was needed, not an ambulance. Shortly other officers began arriving. Most stayed at the scene throughout a preliminary investigation and after both the coroner and the Sheriff of Forest County had been called. This witness identified a plat of the apartment complex, marking thereon where he parked, where he first was accosted by Kiser and Barrett, and the stairway leading to the deceased's apartment. He stated that Kiser and Barrett said they exited the apartment by way of the balcony as Jaggers' body obstructed the front door. The officer also identified a floor plan of an upstairs apartment identical to No. 22. He located on this plat the stairway to the apartment, the front door, and a door leading through the north wall of the livingroom to an outside patio and balcony.

A second officer, Rubin Jones, Jr., received a radio call of the shooting at 7:39 p. m. He was three minutes away. He arrived while Captain Adams was at the door. This witness also found the door partially blocked. He pushed it open enough to enter. He also saw a gun on the floor next to the body which he identified as a .357 blue steel, snubnosed Magnum revolver. He noted a 12 gauge shotgun leaning against the wall to the right of the body and immediately to the left of a gun cabinet. He stated that the two persons present, other than police officers, identified themselves as Kiser and Barrett.

A third officer, Detective James Darrell Smith, responded to a radio dispatcher's call to go to the Chateau Grand Apartments. He arrived at approximately 7:50 p. m. Present at that time were officers Adams and Jones, and Kiser and Barrett. Although an ambulance had arrived, the body was still in place on the floor and he had to squeeze to get in the apartment and then step over the body. He described the body as that of a white male, in his late twenties, with a shotgun wound of the throat and chin. A rolled up newspaper and a .357 Smith and Wesson revolver lay to the front of the body. Against the wall, near a gun cabinet, was a 12 gauge shotgun. Some four or five other guns were in the cabinet. He identified a series of fourteen photographs taken under his supervision which were introduced into evidence. A number of these show the body partially in front of the apartment entrance door, a chair to the right between the body and the gun cabinet, the rolled newspaper and revolver lying in front of the upper torso of the body, and a hand rolled cigarette on the carpet near and in front of the body, later identified as marijuana. This officer examined both weapons. He identified the gun shot as a 12 gauge Remington # 100. The breach was open indicating that the gun had been fired. He found one pellet. He found two spent cartridges in the revolver with four live rounds, the live rounds being next up. From his investigation and questioning of Kiser and Barrett, the detective determined that Kiser fired the shotgun at the deceased from between the chair and gun cabinet, saying that both Kiser and Barrett told him Jaggers entered the apartment with the pistol first pointed at Barrett who hid his face in his hands. Jaggers then turned and pointed the pistol at Kiser. The officer identified a statement given to him and signed by Kiser in the presence of the witness and another officer, Ray Hendrix. The statement is dated the day after the shooting, contains full *Miranda* warnings, and according to Kiser's statement therein, it was freely and voluntarily given. In the statement

Kiser said he and Mike Jaggers, who were friends, had had dinner together the evening before and then went to Jaggers' apartment arriving there about 6:30 p. m. A third friend, "Bo" (Wayne) Barrett arrived about 7 p. m. Jaggers and Kiser began buffeting each other, which Kiser referred to as "horse play". Jaggers went out on the patio. Kiser followed to see what Jaggers was doing. He watched Jaggers swing over the balcony and drop to the ground. Kiser went back into the apartment and he and Barrett locked the door. When Jaggers tried to get in, he couldn't. Kiser said he then picked up a beer can and went over the balcony the same way Jaggers had, intending to come up behind Jaggers and scare him by throwing the beer can under his feet. Jaggers saw him and they walked up the stairs together. "Bo" still had the door locked. Jaggers went back down the stairs, and "Bo" let Kiser in. "Bo", looking out the window, watched Jaggers go to his car and get a revolver. He turned to Kiser and said "He's got that gun. Don't lock that door, he'll shoot you." Kiser then said he realized that Jaggers wasn't joking but was mad. Kiser's statement continues verbatim: "At this point I grabbed the shotgun. I knew that Mike had shot at Bo before and this scared me. Mike came in the door and Bo covered his head with his hands. Mike pointed the gun, a .357 Magnum revolver, at Bo. Then he pointed the gun at me. Mike's face was white. I don't know what I did then, but I was holding the shotgun and i(t) went off and the charge hit Mike. He fell to the floor. I walked over to Mike and knew he was gone. . . . ."

Under cross-examination the witness, Smith, referring to the revolver, said he was unable to find the spent bullets and therefore determined that the revolver had not been fired in the apartment. He stated that Barrett had given conflicting statements to the police, but that Kiser's statement had remained constant throughout. He acknowledged that Kiser said he did not deliberately shoot Jaggers—that the shooting was an accident.

Captain Ray Hendrix, a long time officer in the police department, went to the apartment the day following the shooting for the purpose of taking photographs. He also assisted in questioning Kiser and Barrett and witnessed their statements. He said Barrett was evasive. He identified two separate statements given by Barrett after he was informed of his rights. In one of these statements Barrett said Mike came in the door with a .357 pistol and a newspaper in his hands, and that David had an automatic .12 gauge in his hand and was squatting by the gun cabinet. "At this time the gun David had went off and I saw Mike fall to the floor." In his other statement Barrett said: "I told David that I thought Mike was leaving. Then I saw him reach into the car and I told David that Mike was getting his gun. I started feeling 'shakey' then because I knew Mike. I know him to be a moody person and you never know what he's going to do. I realized then the joking was getting out of hand and I told David he had better quit. The next thing I remember is Mike coming in the door. I was aware of being afraid and trying to get out of the way of any thing that was going to happen. The next thing I knew I heard the shotgun go off. I looked and Mike was on the floor near the door and David was near the gun cabinet, holding the .12 guage (sic) automatic. . . . .". On the basis of these statements, Captain Hendrix stated that he booked Kiser for manslaughter.

A fifth officer to testify was Detective Bobbie Earl Robinson. At the time of the shooting incident, he was in charge of the narcotics division. He analyzed the hand rolled cigarette turned over to him by Detective Smith. From F.B.I. and other training schools, he was taught how to identify marijuana. He ran chemical and microscopic tests and determined that the cigarette contained marijuana. On the day after the shooting, he and other officers made a thor-

ough search of Jaggers' apartment. They found three lids of marijuana, marijuana particles and some syringes in cabinet drawers. Robinson stated that he had previously known Jaggers and knew him to be a user of marijuana and "dope".

At the time Kiser's statement was offered in evidence by the defendant, plaintiff's counsel strenuously objected to its admissibility on the grounds that the statement was not a part of the res gestae, having been taken on the day after the shooting, and that Kiser's statement was self-serving as he had already been booked and charged with manslaughter. The same objections were made to the admissibility of Barrett's two statements. Although Barrett was held only as a material witness, the Court reserved ruling on the admissibility of all three statements.

At the conclusion of defendant's live testimony, the defendant requested leave of the Court to depose Barrett, then in the U. S. Navy and out of the country.

Upon objection by the plaintiff the matter was resolved by the Court to the extent of allowing plaintiff to re-open her case by introducing in evidence a transcript of Barrett's testimony before the Circuit Court of Forest County, Mississippi, in the state's criminal case against Kiser, and both parties were allowed to direct interrogatories to Barrett based on this transcript. The transcript, the interrogatories and Barrett's answers have been duly filed and reviewed by the Court.

In the transcript, Barrett said that he was employed in Jaggers' dental laboratory; that he, Jaggers and Kiser were close friends. Just prior to the shooting Jaggers and Kiser were indulging in "horse-play", described by Barrett as punching around and wrestling. He recounted that Jaggers went out on the terrace and jumped to the ground. Barrett and Kiser determined to play a joke on Jaggers. This took the form of Kiser's following Jaggers over the balcony to scare him with a beer can. They both came back to the apartment by way of the stairs, and Barrett let Kiser in but not Jaggers. Then Barrett, through a window, observed Jaggers go to his car and get a gun. With the gun in his right hand and a rolled newspaper in his left, Jaggers returned up the stairs and entered through the front door which Barrett had unlocked. Barrett said Jaggers was right-handed. Barrett was near a couch on one side of the living room and Kiser was standing by the gun cabinet. As Jaggers came through the door he pointed the pistol at Barrett. Barrett covered his head and then heard a gun blast. When Barrett looked up, he said Kiser was kneeling or squatting to the right of a chair holding a shotgun.

Under cross-examination by Kiser's attorney, Barrett stated that Jaggers owned a number of guns and was very careless in the handling of them. Barrett had earlier in the day of the shooting ridden with Jaggers from his dental lab in Laurel, Mississippi, to Hattiesburg. Along the way without provocation, Jaggers fired the revolver through the car window on the passenger side where Barrett was sitting. Nonetheless, the entire tenor of Barrett's testimony was that he, Jaggers and Kiser were all close friends. Prior to the shooting, no anger was displayed and Barrett's opinion was that Jaggers had no intention of hurting anyone, nor did Kiser. Barrett admitted giving the two heretofore identified statements to the Hattiesburg police on the day following the shooting.

In his answers to defendant's interrogatories Barrett denied that either Jaggers or Kiser had pointed guns at each other prior to the time of the fatal shooting and denied seeing Kiser load the shotgun. He acknowledged that his two statements to the Hattiesburg police were correct. In answers to plaintiff's cross-interrogatories, Barrett said his testimony during Kiser's trial was more accurate than the two statements and he again said that never at any time was he afraid that Jaggers intended any harm to him or Kiser. He said there was no

provocation for any intentional harm inflicted by Kiser on Jaggers. He iterated that all three were close friends, and said he had no reason to believe that the shooting was anything but accidental.

■■ Barrett's transcribed testimony and answers to interrogatories and cross-interrogatories obviously show an attempt on his part to defend his friend Kiser to the extent of showing no premeditation on Kiser's part to shoot Jaggers. Here, however, the Court is not so much concerned with Kiser's intent as it is with Jaggers' actions and intent as he entered the apartment with the loaded revolver. The Court finds that Kiser's and Barrett's statements are admissible for that purpose and they do not compromise in any way Kiser's obvious plea of self-defense in a criminal action not before this Court. The Court has been notified, de hors the record, that Kiser obtained a mis-trial in his criminal action, and he has not been re-tried, although the charges against him are still pending. If for any reason Kiser's statement should be inadmissible, Barrett's statements are not for he acknowledged their existence in his answers to interrogatories.

■ It is clear to the Court that although the so called horse-play between Kiser and Jaggers may not have been sufficient to provoke Kiser to anger, Jaggers was the first to arm himself. When Barrett told Kiser that Jaggers was coming up the stairs with a revolver, Kiser obviously was dismayed enough to secure to himself the protection of the shotgun. As Jaggers entered the apartment, pointing the revolver first to Barrett, then to Kiser, Jaggers was, in the opinion of the Court, the aggressor. The shotgun was in his apartment and readily available to either Kiser or Barrett. He knew or should have foreseen the probable consequence of his own acts. The Court finds that, under these circumstances, the shooting was not accidental.

This being a diversity case, the Court is obliged to apply the substantive law of Mississippi. The applicable rule adopted with approval by the Mississippi Supreme Court in *Taylor v. Insurance Company of North America*, supra, appears in 44 Am.Jur.2d, "Insurance", #1247, p. 92 thusly:

■ "In the absence of any policy provision on the subject, it is a well-established rule that where an insured is intentionally injured or killed by another, and such injury or death is not the result of misconduct or an assault by the insured, but is unforeseen insofar as he is concerned, the injury or death is accidental within the meaning of an accident insurance policy, and the insurer is liable."

Conversely, the rule is stated in #1248, p. 93, Ibid, as:

■ "Clearly, injuries or death sustained by an insured in an encounter brought about by an assault committed by him upon another with a deadly weapon, or upon one who he knew had such a weapon, are not sustained by accident or accidental means within the meaning of an accident policy, since, under such circumstances, the injury or death is the natural and probable consequence of his act."

The *Scales* case is cited in a footnote to the above passage.

In view of the facts as related above, the Court finds that Jaggers, the insured, provoked the encounter with Kiser resulting in Jaggers' death, and such death was the natural and probable consequence of Jaggers' own acts, and that Jaggers knew or should have known that his conduct would result in his injury or death.

Accordingly, the Court finds that plaintiff's action should be dismissed at plaintiff's costs.

An appropriate order may be submitted within the time provided by the local rules of the Court.