Mrs. Veda T. BRITT, Plaintiff-Appellee,

v.

The TRAVELERS INSURANCE COMPANY, Defendant-Appellant.

No. 75–2907.

United States Court of Appeals, Fifth Circuit.

July 25, 1977.

Alben N. Hopkins, Gulfport, Miss., for defendant-appellant.

Harry R. Allen, Gulfport, Miss., Emmett R. Cox, John F. Janecky, Mobile, Ala., for plaintiff-appellee.

Before WISDOM, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

This is a diversity suit founded upon Mississippi law. The principal issue is whether a double indemnity provision in a life insurance policy issued by defendant Travelers Insurance Company to the deceased, Solon W. Britt, can properly be interpreted to cover the death of Mr. Britt on December 21, 1971 due to exposure. Travelers paid the face amount of the policy, $50,000, but refused to pay the additional $50,000 that was due only if the death was accidental as defined in the policy. Mrs. Veda T. Britt, wife of the deceased and the beneficiary under the policy, is the plaintiff. The jury found against Travelers and judgment was entered accordingly. Because the court erred in instructing the jury on the burden of proof, we reverse and remand.

The deceased, Solon W. Britt, was a loan broker in Picayune, Mississippi until he became incapable of operating his business due to physical and mental disabilities. His business was placed in receivership and Mr. Britt was committed from January 16 until May 31, 1971 to DePaul's Sanitorium in New Orleans. During this period Mr. Britt's doctors described him as confused, depressed, unable to orient himself in his surroundings and at times paranoid. Dr. James T. Henry, his attending psychiatrist, stated that Mr. Britt's condition was due to abuse of alcohol and drugs, primarily diet pills. However, while hospitalized at DePaul's Mr. Britt's condition improved. When released, his condition was described as recessive and improving. Dr. Henry believed Mr. Britt's forced abstinence from both drugs and alcohol was a prime reason for his partial recovery.

After being released from DePaul's, Mr. Britt apparently reverted to drinking heavily. He was committed on September 2, 1971 to the Mississippi State Hospital at Whitfield. The attending psychiatrist there, Dr. David Davidson, similarly diagnosed Mr. Britt's disabilities as stemming from alcohol and drugs but believed the damage to his brain to be permanent. Dr. Davidson believed Mr. Britt to be suffering from organic brain syndrome, a form of permanent brain damage that Dr. Davidson testified reveals itself in symptoms of anxiety, depression and lowered intelligence. Mr. Britt was given a wide range of achievement tests. His spelling, reading and mathematic comprehension had been reduced to that of a fourth grader. Some improvement occurred while at Whitfield but Mr. Britt remained depressed and anxious. When discharged on October 12, 1971, he was no longer considered psychotic. Dr. Davidson stated that Mr. Britt still actually needed constant supervision and the statement on his discharge records that he was released into his own custody merely reflected that Mr. Britt was no longer considered to be out of contact with reality.

Mrs. Britt testified that after her husband's release he functioned in a fairly normal manner. He was suffering from prostate trouble which apparently was diagnosed during his stay at Whitfield. On Friday, December 17, 1971, Mr. Britt was scheduled to have an appointment with Dr. Henry concerning this ailment. The evidence indicates that Mr. Britt may have arranged to ride into New Orleans with some friends to see Dr. Henry. Other evidence indicates he might have ridden a bus. Mrs. Britt testified that she does not know how he did get to New Orleans that day, though she does remember his getting out of bed in the early morning and that he did not take the family car. Dr. Henry stated that Mr. Britt did keep his appointment and complained of the prostate problem. Dr. Henry did not notice any serious mental deficiencies. Mr. Britt was oriented and did not appear confused, was logical and coherent in his conversation and was capable in Dr. Henry's view of functioning in society.

Mr. Britt's actions during the following weekend are unknown. Mrs. Britt called

the police on Saturday morning, December 18, after her husband failed to return. On Monday, December 20, Mr. Britt was discovered lying in a pool of water behind a radio station in Pearl River, Louisiana, a town approximately fifteen miles south of the Britt home in Picayune. After he was sighted by station personnel, Mr. Britt remained in the ditch behind the radio station in the cold rainy weather for nearly two hours before an ambulance and police arrived. He was unable to walk and barely able to speak clearly enough to be understood. His skin had turned blue from the cold. A police investigation revealed no evidence of violence. An oily substance one witness likened to a preservative used on stored firearms covered his body. Although Mr. Britt was wearing his pants, his shirt was lying nearby. His pockets were empty. Mr. Britt was intermittently coherent and at times mentioned a wood box or stated that he had been carried to this site in a wooden box. He was moved to a charity hospital in New Orleans and then to the Oschner Foundation Hospital.

While hospitalized Mr. Britt suffered two cardiac arrests but on each occasion was revived. Dr. Paul Murison, who treated Mr. Britt after his arrival at Oschner, stated that exposure to the cold precipitated the heart attacks and had inflicted damage upon his kidneys. No appreciable amount of alcohol was found in his blood and Dr. Murison did not believe alcohol or drugs had contributed to the condition. Mr. Britt died on Tuesday, December 21. The causes of death listed on the death certificate and which were determined before the autopsy were exposure, acute renal failure and cardiac arrest.

An autopsy was conducted by Dr. George Leonard. Dr. Leonard testified that he identified two separate types of cause of death. The first he termed the immediate cause, i. e., the specific, operative reason a person dies at a particular moment. The second is the underlying or long term defect which causes or contributes to morbidity. In the case of Mr. Britt, the immediate causes according to Dr. Leonard's autopsy were congestion and swelling of the lungs, early stage pneumonia, death of part of the tissues of the kidney, infarction of the small intestine, congestion of the liver, kidney and spleen, and swelling of the brain. The underlying cause identified by Dr. Leonard was exposure. The autopsy also revealed that Mr. Britt had at least for several months and probably for several years been suffering from arteriosclerotic cardiovascular disease (hardening of the arteries), coronary arteriosclerosis (hardening of the arteries of the heart), coronary hypertrophy (an enlarged heart), arteriolar nephrosclerosis (hardening of the kidney), cirrhosis of the liver and other ailments. There was testimony that each could at an advanced stage have caused death independently of exposure. There was conflicting testimony as to whether any did contribute to Mr. Britt's death on December 21.

Three issues are raised on this appeal: (A) Was Mr. Britt's death from exposure due to "accidental injury" as defined under the insurance policy; (B) if the exposure constitutes accidental injury, was it the direct and independent cause of death without any contribution by other causes; and (C) were the trial court's instructions to the jury on these issues proper? Though we reverse and remand due to an error in one key instruction, all contentions presented are considered to facilitate the final resolution of issues that are likely to recur on retrial.

The policy issued by Travelers stated in part:

Benefits—The Travelers Insurance Company will, subject to the terms and conditions of this Provision, pay to the Beneficiary designated in the basic contract the amount of Additional Indemnity shown in the SCHEDULE OF BENEFITS, upon receipt of due proof: (1) that the death of the Insured resulted from an accidental bodily injury which was the direct and independent cause of death; and (2) that such injury, except in instance of drowning or internal injury revealed by autopsy, produced a visible wound or contusion on the exterior of the body; and (3) that

such death occurred within 90 days after the date of the accident; and (4) that the accident occurred before termination of this Provision as provided in the section entitled "Termination."

Exclusions—No benefit under this Provision will be payable if death results from or is contributed to by:

1. Any bodily or mental infirmity or disease, even though the proximate or precipitating cause of death is accidental bodily injury.

.    .    .    .    .

### A.

■ Travelers first contends that Mr. Britt's death from exposure was not as a result of "accidental bodily injury," citing various precedents dealing with similar phrases in insurance contracts. However, the issue is foreclosed by the Mississippi Supreme Court's determination in *Britt v. All American Assurance Co. of Louisiana*, 333 So.2d 629 (Miss.1976) that accidental bodily injury does include death by exposure. The Mississippi court was there faced with an appeal by Mrs. Britt in her suit against another insurer of her husband. The accidental death benefits provision in the policy there at issue stated that an additional death benefit would accrue if the insured's death "resulted directly from bodily injury caused solely by external, violent, and accidental means and independently of all other causes  .  .  .  ." *Id.* at 631. The court concluded that death from exposure is an accidental death resulting from bodily injury caused by external and violent means. The present policy does not include the All American requirement that death result from external and violent means. Travelers required only that death be the product of accidental bodily injury. We therefore reject Travelers' position on section (1) of the "Benefits" provision.

Section (2) requires "that such injury, except in instance of drowning or internal injury revealed by autopsy, produced a visible wound or contusion on the exterior of the body."[1] The only precedent cited to this court presenting this type of insurance policy provision is *National Life & Accidents Insurance Co. v. Leverett*, 215 S.W.2d 939 (Tex.Civ.App.—Eastland 1948, writ dism'd). There the policy required that death be directly and independently of all other causes a result of internal injuries revealed by autopsy. During an operation for the removal of his tonsils, the deceased was injected with novocaine. The beneficiary's position at trial was that the needle was improperly inserted into the deceased's mouth and pierced an artery, thereby causing the drug to go immediately into the blood stream. The deceased suffered convulsions, turned blue, and then his heart stopped. Attempts to revive him failed. An autopsy revealed cerebral congestion that could have been the result of the improper application of novocaine and could have caused the convulsions and coronary arrest. This was held to be sufficient to present to the jury the question of whether the insured died "from internal injuries revealed by autopsy."

In *Insurance Co. of North America v. English*, 395 F.2d 854 (5th Cir. 1968), the court applied Mississippi law in interpreting a life insurance policy provision covering loss resulting "from bodily injuries caused by accident." The deceased's death was a result of an acute coronary occlusion caused by the "fright and psychic trauma" that followed a sudden, violent electrical discharge. Finding that this accident was within the coverage of the policy, the court determined that bodily injury need not be from an external physical force against the body. Instead, death resulting from a coronary occlusion caused by fright was death from accidental bodily injury. The specific physical condition that constituted the bodily injury was not expressly stated in the opinion, probably because the policy did not require that the injury be revealed by au-

---

1. The court informed the jury that Mrs. Britt urged only that the injury was revealed by autopsy and that no consideration therefore need be given to whether the injury produced a visible wound or contusion on the exterior of the body. All the relevant testimony indicated none of the minor abrasions on the deceased's body could have contributed to the death.

topsy as is necessary here, but a cardiologist testified to his belief that the deceased had suffered from ventricular fibrillation, "a condition of the heart in which the various muscles of the heart contract without co-ordination and, consequently, the heart becomes ineffective on doing its normal job of pushing the blood around in the system, causing the patient to die as a result of lack of circulation." *Id.* at 856. The court concluded "[w]e have no difficulty in characterizing the internal injuries as the 'bodily injuries' required by the policy terms." *Id.* at 860.

It can hardly be denied that Mr. Britt suffered internal reactions to the exposure that caused his death. The question is whether these reactions were internal injuries revealed by autopsy. Travelers called as an expert witness Dr. William Atchison, a pathologist. On cross-examination he responded to a question of whether the failure and deterioration of certain organs in Mr. Britt's body could be called "injuries."

> I would have to say—I don't—if I had a dictionary I would like to see what injury really means, but the context as I understand it, I might say "insult" or injury, using insult and injury, that any physiological phenomenon that we are talking about such as shock, which has a following destruction of the kidney which cannot sustain prolonged irreversible shock, the kidney would die and you saying it was injured by this pre-existing shock, I would say yes to that. O.K.?

■ Upon autopsy, Mr. Britt was found to have suffered from congestion and swelling of the lungs, death of some of the tissues in the kidney, infarction of the small intestine, congestion of the liver, spleen, and kidney, and some swelling of the brain. These indications of physical deterioration were in the view of the doctor who conducted the autopsy, Dr. George Leonard, internal effects of the exposure suffered by the deceased and the immediate cause of death. These are "injuries" within the principles discussed in *Insurance Co. of North America v. English, supra.* There was sufficient evidence therefore to make an issue for the jury as to whether Travelers was liable under this section of the policy.

### B.

■ Travelers next contends it has no liability for double indemnity since the bodily injuries must be "the direct and independent cause of death" and death must not be as a result of or contributed to by "any bodily or mental infirmity or disease, even though the proximate or precipitating cause of death is accidental bodily injury." Both parties cite to the long line of Mississippi cases commencing with *United States Fidelity & Guaranty Co. v. Hood,* 124 Miss. 548, 87 So. 115 (1921), dealing with recovery under life insurance policies for accidental death when the deceased had also suffered from physical ailments prior to the accident. The most factually analogous precedent is *United States Fidelity & Guaranty Co. v. Smith,* 249 Miss. 873, 164 So.2d 462 (1964). The insured was injured in a car accident. For several days after the accident and until his death he complained of chest and abdominal pains. An autopsy revealed that an aortic aneurysm had existed for several years and had ruptured. The policy there stated:

> If the insured shall, through accidental means, sustain bodily injuries as described in the Insuring Clause, which shall, independently and exclusively of disease and all other causes, immediately, continuously, and wholly disable the Insured from the date of the accident and result in any of the following specific losses within thirteen weeks, the Association shall pay:
>
> For loss of life . . . $5,000.00.

The Mississippi Supreme Court held that there would be liability under this policy provision if the car accident injury proximately caused the death. The basic principle was held to be:

> If the accident, which the jury found to be true in the case at bar, is a proximate cause of death, if in turn it sets in motion a train of events leading directly to death, then the death results from the accident. This is true even though the

state of health of the insured is delicate so that he is killed by injuries that probably would not have been fatal to one in normal health.

*Id.,* 164 So.2d at 470. Thus liability exists under Mississippi law even though an insurance policy expressly requires that the accidental injury be the sole cause of death, where pre-existing infirmities were merely set in motion by the accident and despite the fact that an otherwise nonlethal accident is aggravated into a fatal one by a disease or non-accidental condition. "It is the causing of the death, not the condition without which the death would not have occurred," that fixes liability under a policy insuring against death from bodily injury solely caused by accidental means. *Id.* at 470.

The Mississippi Supreme Court has distinguished between those pre-existing diseases that are active and virulent as opposed to ones merely latent. In *United States Fidelity & Guaranty Co. v. Hood, supra,* 124 Miss. 548, 87 So. at 119, the court held:

> We think that, if the accident is the proximate cause of the death and sets in motion or starts a latent or dormant disease, and such disease merely contributes to the death after being so precipitated by the accident, it is not a proximate cause of the death nor a contributing cause within the meaning of the terms of the policy.

Conversely, in *Mutual of Omaha Insurance Co. v. Deposit Guaranty Bank & Trust Co.,* 246 Miss. 640, 151 So.2d 816 (1963), the court found insufficient evidence to permit the beneficiary to recover under an insurance policy giving additional benefits when the insured died of accidental bodily injuries which were independent and exclusive of all other causes of death. Testimony indicated that the insured had such an active and virulent heart condition that he might, according to one doctor, have died at any time. Two automobile accidents in which the insured had been involved within one year, the second one merely a few days before his death, were only contributions to the insured's death from a heart attack.

The instant case does not present a situation where the heart disease of the insured was latent and dormant and then activated by an accident, but the proof is undisputed that [the deceased] had an active virulent and progressive heart ailment, and that therefore the Mississippi and other cases relied upon by the appellee where the disease was latent and dormant do not apply in the instant case. *Id.,* 151 So.2d at 820.

Testimony in the present case was in conflict. According to Dr. William Atchison, the expert pathologist witness for Travelers, Mr. Britt's pre-existing diseases endangered his life apart from the exposure. He testified that each of these were chronic diseases associated with aging. Dr. Atchison, relying on the autopsy report, stated he would not say that Mr. Britt had had a heart attack and that this was the cause of death. He testified that the congestion of Britt's lungs, early pneumonia, death of tissues of the kidneys and other "immediate causes of death" as defined in the autopsy were perfectly consistent with exposure. He did, however, refuse to exclude the previous drug and disease weakening of the heart and other organs as possible contributing causes of a death due to respiratory and heart failure.

Dr. George Leonard, who conducted the autopsy, testified to having found evidence of pre-existing disease. However, when asked whether these pre-existing conditions could have had anything to do with Mr. Britt's death he stated:

> No, that wouldn't have anything to do with it. The only underlying conditions that he had were heart disease and liver and that would not have anything to do with the immediate causes of death. I would have to look—if I didn't know anything about the history [of having suffered exposure], I would have to look for some other metabolic electrolyte—some other insult that caused this metabolic electrolyte abnormality.

He denied that the heart, kidney, and liver disease had progressed sufficiently "to explain death or to be associated with death

of and by themselves." Dr. Leonard also stated that the pre-existing heart, liver and kidney disease would not, unless only "to a very slight theoretical degree," have rendered these organs less able to resist the effects of exposure. In his view the congestion of the lungs and other direct results of the exposure solely caused Mr. Britt's death. Neither was the effect of alcoholism a cause of death. Even without the previous heart and liver conditions Dr. Leonard believed Mr. Britt would have died from the exposure.

We find no difficulty in concluding that such testimony could support a finding, under the *Hood* line of cases, that liability for accidental injury would exist despite the pre-existing ailments.

However, Travelers points out that the present policy, apparently drafted in reaction to these precedents, requires a different analysis. Unlike the cited cases, the Travelers policy requires that death may not be contributed to by "[a]ny bodily or mental infirmity or disease, even though the proximate or precipitating cause of death is accidental bodily injury." This language does successfully counter the *Hood* line of holdings predicating liability on an accident which is the proximate cause of death, even though the accident sets in motion or starts a latent or dormant disease which then contributes to the death. Travelers' policy directly parries this reasoning by prohibiting recovery when the disease contributes to the death even though the latent or dormant disease was precipitated and made active by the accident.

■ Though we hold that merely showing under the *Hood* line of cases that the pre-existing disease was dormant and was made active by the accident is insufficient, this does not conclude the issue. If a jury accepts the testimony of Dr. Leonard, then the pre-existing ailments had nothing at all to do with Mr. Britt's death. We note that Dr. Leonard's opinion was controverted at least in part by the testimony of Travelers' expert, Dr. Atchison. The question should be resolved by a jury properly instructed that the pre-existing disease must not have contributed to the death of the insured.

## C.

Travelers' contention that the jury was improperly instructed as to the proof necessary to permit recovery focuses on this portion of the trial court's complex instructions:

*In the "Benefits" section of this policy, Exhibit P–1, provision number (1) therein states, "that the death of the insured resulted . . ." must be shown to have . . . "resulted from an accidental bodily injury which was the direct and independent cause of death" and the law of the State of Mississippi is that if there is an accidental bodily injury which I am going to try to define for you as best I can, if that was the precipitating or proximate cause of death, that is that it precipitated a latent or dormant condition that existed in the deceased, that even though the latent or dormant physical disease or condition that existed was there and contributed to cause the death of the deceased, that would not bar recovery, if you find from a preponderance of the evidence that there was an accidental bodily injury which was the direct and proximate—independent and proximate cause of his death.*

*However, in the "Exclusions" section, particularly paragraph 1., the policy reads: "No benefit under this Provision will be payable if death results from or is contributed to by: Any bodily or mental infirmity or disease, even though the proximate or precipitating cause of death is accidental bodily injury." If the defendant proves by a preponderance of the evidence that this exclusionary clause came into play, that is if he proved—that is, if the defendant has proved to your satisfaction in that manner, that the death of Solon W. Britt, Jr., resulted from or was contributed to—and not proximately, but just resulted from or was contributed to, and that means substantially contributed to by any bodily or mental infirmity or disease, that plaintiff is not entitled to recover under the provi-*

*sions of this policy* and the defendant would be entitled to a verdict, in that event, *even though the proximate or precipitating cause of death is accidental bodily injury.* And, of course, the same holds true if death resulted from or was contributed to by suicide, and the defendant in that event, for either one of these two exclusions to bar recovery in this case, need not prove by a preponderance of the evidence that any or either of those two provisions—at least, those two conditions if they did exist even proximately contributed to cause death, that is, precipitated or proximately caused, but if those conditions existed in Solon W. Britt, Jr. and played a substantial part in causing his death, that is, any bodily or mental infirmity or disease or suicide, then in that event *plaintiff would not be entitled to recover under the terms and conditions of this policy, despite the fact that that bodily or mental infirmity or disease or suicide, if any, was not even a proximate cause, but merely that death resulted from or was contributed to by either of those conditions,* plaintiff would not be entitled to recover even though the proximate or precipitating cause of death was accidental bodily injury. [Emphasis supplied.]

This instruction properly informs the jury that the evidence held sufficient under the *Hood* cases is insufficient in the present suit. The trial court has interpreted the "Benefits" section of the policy to be comparable to the insurance policies considered in *Hood* and its progeny, but advises that the "Exclusions" language changes the evidentiary support long held sufficient to impose liability. This is exactly the construction given the policy by Travelers and we find no error in this regard.

■ However, the instruction raises several different, discrete issues. The first is that it fundamentally misdirected the jury on the burden of proof by requiring that Travelers prove by a preponderance of the evidence that a pre-existing mental or physical infirmity contributed to the death. This is the heart of the case. Mrs. Britt did offer proof that established a prima facie

case of accidental death. However, Travelers presented rebuttal evidence indicating that Mr. Britt suffered from mental and physical ailments that may have contributed to his death. Although certain cases have indicated otherwise, *e. g., Massachusetts Protective Association v. Cranford,* 137 Miss. 876, 102 So. 171 (1924), the Mississippi Supreme Court has recently stated that the burden of proof never shifts to the defendant company under an insurance policy. Once the beneficiary has established a prima facie case of accidental death, the insurer must then go forward with evidence to indicate other than accidental causes. *Taylor v. Insurance Co. of North America,* 263 So.2d 749, 751 (Miss.1972). The burden for the whole case, however, remains upon the beneficiary and it was error to require Travelers to bear it. Since Travelers presented evidence that Britt's death resulted from some or all of his pre-existing conditions it was entitled to have a jury resolve the question of its liability under instructions which made clear that Mrs. Britt, not it, had the burden of proof. Travelers properly preserved its contention by objecting to this instruction. The objection should have been sustained. It is due to this error that the case must be reversed.

■ This is not to say that we find reversible error in the instructions because they placed upon Travelers the burden of proving Mr. Britt committed suicide. Mrs. Britt successfully established a prima facie case of accidental death. No testimony was introduced raising the issue of suicide. Though the trial court technically was incorrect in stating that Travelers had the burden of proving suicide, we find this error to be harmless as no evidence was presented by Travelers after the burden of going forward was placed upon them. *See Freed v. Protective Life Insurance Co.,* 405 F.Supp. 175, 177 (S.D.Miss.1975).

■ Travelers takes issue with several other facets of the instructions, but we find no error in these. The trial court required that the pre-existing ailments must have "substantially" contributed to death. Trav-

elers complains that this imposed a burden not contemplated by the policy. The jury was also instructed that "an injury or damage or death is 'proximately caused' by an act, or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage, or death. . . ." Thus the jury was required to conclude that the accidental exposure or any other possible cause, as well as pre-existing illness, must have substantially contributed to death before it could be considered a cause of death for policy purposes. This reflects the concern that it may never be possible to assign a finite number of causes for an event. "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond." W. Prosser, Law of Torts § 41 at 236. "The event without millions of causes is inconceivable; and causation alone can provide no clue of any kind to singling out those which are to be held legally responsible." *Id.* at 239. *See United States Fidelity & Guaranty Co. v. Smith*, 249 Miss. 873, 164 So.2d 462, 470 (1964). Though it would have been preferable for the court to define "substantial," the word has a sufficiently normal meaning to inform a jury that a pre-existing disease must be a more than insignificant factor in producing death to come within the exclusion language of the policy. This construction accords with Mississippi treatment of the clause construed in the *Hood* line of precedents discussed above.

Travelers more broadly insists that the trial court improperly instructed the jury "in practically every instruction given." Error allegedly occurred when the trial court informed the jury that Mrs. Britt did not contend that the exposure created a "visible wound or contusion on the exterior of the body," but instead was relying on the portion of the policy that permitted recovery when an internal injury occurred that was revealed by autopsy. This indeed was Mrs. Britt's position and accorded with the evidence. The apparent basis of Travelers' complaint is that this instruction somehow denied it an opportunity to argue Mrs. Britt failed to sustain her burden of proof. Narrowing the issues for the jury is a proper function of instructions and we find no error in this portion of the charge.

The trial court's instruction defining bodily injury is also attacked. This is how it explained the term:

I instruct you that in order to constitute bodily injury within the meaning and provisions of this policy in question *there need have been no trauma or blow or exertion of physical force.* However, I instruct you—strike "however". I instruct you that the term *bodily injury is not confined to a trauma or blow to the body or physical force exerted on the body but can be any localized or normal condition of the living body proximately caused by external means and not caused by mental or physical disease or infirmity.* In other words, in an accidental bodily injury, it may be defined as a localized, abnormal condition of the living body directly and contemporaneously caused by accident. An accident may be defined as an unlooked-for mishap or an untowards event or an unexpected condition which is externally applied to the body to cause bodily injury—internal bodily injury as revealed by an autopsy.
[Emphasis supplied.]

In essence, Travelers complains of the language that a bodily injury can be any "localized, abnormal condition of the living body directly or contemporaneously caused by an accident."[2] It is clear that the purpose of this instruction was to structure the jury's consideration of whether exposure could constitute accidental bodily injury. The issue when submitted to the jury was open in Mississippi. It is no longer after the opinion of the Mississippi Supreme Court in *Britt v. All American Assurance*

---

**2.** Either the transcription is in error or the trial court erred in first using the phrase "localized, *normal* condition" rather than "*abnormal* condition," but the initial mistake if it occurred was corrected and would not have misled the jury.

*Co. of Louisiana*, 333 So.2d 629 (Miss.1976). The district court correctly predicted the course of Mississippi law.

▊ Travelers next contends that the trial court peremptorily instructed the jury on certain aspects of the case. We find the argument to be based on nothing more than a hypertechnical reading of the complained-of charges. The trial court instructed the jury:

I instruct you that even if you find that the decedent voluntarily exposed himself to the cold and damp elements of the weather for a period of time which caused him to suffer exposure which was the proximate cause of his death if such you find from a preponderance of the evidence in this case, that such death was not intended from the standpoint of the decedent or by a reasonable man under the same circumstances.

Alone this paragraph could indicate that the trial judge peremptorily instructed the jury that Mr. Britt's death from exposure was unintentional. However, immediately following this language the judge stated:

You are instructed that the death from exposure was accidental if you further find from a preponderance of the evidence that the terminal result of such exposure, if any, was undesigned, unintended, unexpected, and unpremeditated.

This language sufficiently informed the jury that it was their function to determine whether the exposure was accidental, and that they must find it to be accidental "*if* you further find . . . that the terminal result of such exposure, if any, was undesigned, unintended, unexpected, and unpremeditated" (Emphasis supplied). Read together as they must be, the words do not create reversible error.

Travelers' final argument asserts that certain exclusions apply to bar recovery. Part of this argument has been considered and rejected in determining whether exposure was the sole cause of death. There, however, the issue was considered in the light of the physical reasons for Mr. Britt's death and sufficient evidence was found to support the conclusion that the direct ef-

fects of exposure were the sole reasons for death. Travelers also argues that Mr. Britt's admitted mental infirmity—admitted only as to its existence but contested as to its extent—was a contributing cause of death. Testimony from Dr. Davidson of Whitfield State Hospital indicated that Mr. Britt's organic brain syndrome prevented him from orienting himself. On the other hand, testimony of Dr. James Henry, whom Mr. Britt saw on December 17 immediately preceding his disappearance, was that Mr. Britt was coherent and seemingly capable of functioning in society. Indeed, if the same evidence is presented on retrial, what did happen to Mr. Britt during these two weekend-days remains the type of factual mystery a jury must solve.

REVERSED AND REMANDED.